UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 16-81795-CIV-MARRA/MATTHEWMAN

ENGINEERED TAX SERVICES, INC., a
Florida corporation

       Plaintiff,

v.

SCARPELLO CONSULTING, INC., a
Nebraska corporation,

       Defendant.

_____/

## **ORDER**

This action arises out of Defendant Scarpello Consulting, Inc.'s alleged improper use of Plaintiff Engineered Tax Services, Inc.'s trademark "Engineered Tax Services" as part of Defendant's Google advertising campaign.  Plaintiff has brought claims for violations of various provisions of the Lanham Act (Counts I through V), as well as state common law claims (Counts IV through VIII).  (DE 1.)  The matter is before the Court upon the parties' cross motions for summary judgment (DE 93, 100), which are fully briefed.  (*See* DE 107, 110, 121, 124.)

Defendant seeks summary judgment on all of Plaintiff's claims, arguing that Plaintiff's trademark is not eligible for protection because it is either an unprotectable generic mark or a descriptive one that lacks any secondary meaning.  Plaintiff claims that the mark is suggestive and that Defendant's use of the mark causes a likelihood of confusion.  Plaintiff also seeks summary judgment in its favor.   The Court has carefully considered the motions and the entire record and is otherwise fully advised in the premises.  Because the Court concludes that Plaintiff's mark is merely descriptive of an aspect of Plaintiff's service and that Plaintiff has not met its burden of presenting

sufficient evidence to create a jury question on the issue of secondary meaning, the Court is compelled to conclude that Defendant's motion must be granted on all except two of Plaintiff's claims, and that Plaintiff's motion must be denied.  As to the two remaining claims, which are Plaintiff's common law claims of trespass and unjust enrichment, the Court declines to exercise jurisdiction over them and dismisses them without prejudice.

## I.    <u>LEGAL STANDARD</u>

The Court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The burden of establishing the absence of a genuine issue of material fact lies with the moving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record,] which it believes demonstrate the absence of a genuine issue of material fact."  *Id.*  To discharge this burden, the movant must point out to the Court that there is an absence of evidence to support the nonmoving party's case.  *Id.* at 325.  The material in the record must be viewed in a light most favorable to the nonmoving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

After the movant has met its burden under Rule 56(a), the burden of production shifts and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . .; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce

2

admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) and (B).

Essentially, so long as the non-moving party has had an ample opportunity to conduct discovery, it must come forward with affirmative evidence to support its claim. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 257 (1986). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990). If the evidence advanced by the non-moving party "is merely colorable, or is not significantly probative, then summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal citations omitted).

For issues on which the movant would bear the burden of proof at trial, the Court of Appeals for the Eleventh Circuit has explained:

> that party must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial. In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party. If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the non-moving party, in response, come [s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact.

*Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (citation and internal quotation marks omitted; emphasis in original).

## II.    <u>DISCUSSION</u>

A.    Trademark Infringement of a Registered Mark under the Lanham Act

Under the Lanham Act, a defendant is liable for trademark infringement if he, without consent, uses "in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark" that "is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1).

"To establish a prima facie case of trademark infringement under § 1114, a plaintiff must show (1) that it had trademark rights in the mark or name at issue and (2) that the other party had adopted a mark or name that was the same, or confusingly similar to its mark, such that consumers were likely to confuse the two." *Commodores Entm't Corp. v. McClary*, 879 F.3d 1114, 1130–31 (11th Cir. 2018).

This case begins and ends with the first element of the trademark infringement claim. Only marks that are capable of distinguishing the owner's goods from those of others, i.e., that are sufficiently "distinctive," are eligible for federal protection. *Tana v. Dantanna's*, 611 F.3d 767, 773 (11th Cir. 2010). The parties agree that because Plaintiff's mark "Engineered Tax Services" is registered, Plaintiff is entitled to a rebuttable presumption that its registered mark is inherently distinctive. But Defendant can rebut that presumption with significantly probative evidence that the mark is not inherently distinctive. (*See* DE 93, Def.'s Mot. at 6; DE 100, Pl.'s Mot. at 9.)[1]

The Court of Appeals for the Eleventh Circuit has identified four categories of distinctiveness, listed in ascending order of strength, the third and fourth of which are deemed "inherently distinctive":

> "(1) generic—marks that suggest the basic nature of the product or service; (2) descriptive—marks that identify the characteristic or quality of a product or service; (3) suggestive—marks that suggest characteristics of the product or service and

---

[1] There is no dispute that the federal Patent and Trademark Office ("PTO") issued Plaintiff a certificate of registration without requiring a showing of secondary meaning. *Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1357 n.3 (11th Cir. 2007) ("Registration establishes a rebuttable presumption that the marks are protectable or "distinctive." 15 U.S.C. § 1057(b). The sort of presumption appropriate depends on whether the Patent and Trademark Office has required proof of secondary meaning. *See Borinquen Biscuit Corp. v. M.V. Trading Corp*., 443 F.3d 112, 117 & n. 2 (1st Cir. 2006) (If no proof of secondary meaning is provided, presumption is that mark is inherently distinctive; if proof of secondary meaning is provided, presumption is that mark has secondary meaning.)").

require an effort of the imagination by the consumer in order to be understood as descriptive; and (4) arbitrary or fanciful—marks that bear no relationship to the product or service, and the strongest category of trademarks." *Gift of Learning Found., Inc. v. TGC, Inc.*, 329 F.3d 792, 797–98 (11th Cir. 2003). Suggestive and arbitrary or fanciful marks are deemed "inherently distinctive" because "their intrinsic nature serves to identify a particular source of a product" and are generally entitled to trademark protection. *Two Pesos*, 505 U.S. at 768. Generic marks, on the other hand, are generally incapable of receiving trademark protection and may never be registered as trademarks under the Lanham Act. *Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1358 (11th Cir.2007); *Coach House Rest.*, 934 F.2d at 1560. Descriptive marks, though not inherently distinctive, may become sufficiently distinctive to enjoy trademark protection by acquiring "secondary meaning." 15 U.S.C. § 1052(f); *Coach House Rest.*, 934 F.2d at 1560. "A name has acquired secondary meaning when the primary significance of the term in the minds of the consuming public is not the product but the producer." *Welding Servs.*, 509 F.3d at 1358 (internal quotation and citation omitted).

*Tana*, 611 F.3d at 774.

The parties dispute the distinctiveness of the mark "Engineered Tax Services." Whereas Plaintiff argues in its briefs that the mark is suggestive, Defendant argues that it is descriptive or generic. Plaintiff argues that "Engineered Tax Services" is suggestive of its services rather than descriptive or generic because neither the services of an engineer nor the services of an accountant is required to prepare cost segregation reports. Defendant, on the other hand, argues that the mark is generic or descriptive because it describes an important feature of Plaintiff's cost segregation and energy-related tax studies, which is the utilization of an engineer. Defendant underscores that it is undisputed that Plaintiff offers engineering-based reports to taxpayers claiming cost segregation and energy-related tax benefits on their tax returns, and that the utilization of an engineer is commonly regarded in the industry as the preferred approach to preparing these reports for tax purposes. In addition, Defendant argues that Plaintiff has not met its burden of showing that the mark has acquired secondary meaning and therefore the mark is not protectable. The Court considers the

parties' arguments below.

        1.    Distinctiveness

When determining whether a particular mark is suggestive or descriptive, courts have used a variety of guideposts and tests.  As a starting point, courts consider the dictionary definitions of the terms comprising the mark to determine "the ordinary significance and meaning of words to the public."  *Heritage Life Ins. Co. v. Heritage Life Ins. Co.*, 494 F.2d 3, 11 n.5 (5th Cir. 1974)[2]; *Investacorp, Inc. v. Arabian Inv. Banking Corp. (Investcorp) E.C.*, 931 F.2d 1519, 1523-24 (11th Cir. 1991) ("[P]robative of the descriptiveness of a mark is the idea that is conveyed to the observer by the plain dictionary definition of the formatives comprising the mark."); *Vision Ctr. v. Opticks, Inc.*, 596 F.2d 111, 116 (5th Cir. 1979) (considering the dictionary definition of the words comprising the mark to determine distinctiveness).

A test that courts employ to distinguish between descriptive and suggestive terms is the "'imagination test,' which seeks to measure the relationship between the actual words of the mark and the product to which they are applied."  *Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 452 (5th Cir. 2017) (citation and internal quotation marks omitted).  The "imagination test" asks whether a "customer who observes the term can readily perceive the nature of plaintiff's services, without having to exercise his imagination."  *Investacorp,* 931 F.2d at 1524 ( "Because the customer who observes the term can readily perceive the nature of plaintiff's services, without having to exercise his imagination, the term cannot be considered a suggestive term.").  The determination of whether a mark is descriptive requires consideration of the meaning of the term or

---

    [2]  *See Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981) (holding that decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981, are binding in the Eleventh Circuit).

mark to the prospective purchasers and not to the public in general.  *Educ. Dev. Corp. v. Econ. Co.*, 562 F.2d 29 (10th Cir. 1977).

Next, courts asks "whether competitors would be likely to need the terms used in the trademark in describing their products."  *Vision Ctr.*, 596 F.2d at 116 (citation and internal quotation omitted).

Finally, courts consider the extent to which third parties use a mark as probative evidence of descriptiveness.  *Gift of Learning Found., Inc. v. TGC, Inc*., 329 F.3d 792, 798-99 (11th Cir. 2003) ("[T]he evidence of various competitions being held around the country using variations of the terms drive, pitch, and putt . . . indicates that the use of these terms in connection with golf skills challenges is not a particularly innovative idea.").

"Merely descriptive terms may not be registered because they do not advise the buyer that the product comes from a single source and because trademark protection would infringe on common speech."  *Educ. Dev. Corp.,* 562 F.2d at 28.

Applying those guiding principles and tests, the Court concludes that significantly probative evidence in the record shows that the mark "Engineered Tax Services" is descriptive rather than suggestive, thereby rebutting the presumption of inherent distinctiveness.  Starting with the dictionary definitions of the words comprising the mark, the Court looks to the definitions of the key words "Engineered," "Tax," and "Services."  The dictionaries *Random House College Dictionary* and *Webster's II New Riverside Dictionary* define the word "engineer" as "[t]o plan and manage as an engineer."  The words "tax" is defined as a "sum of money levied upon incomes . . . by a government for its support . . ." and the word "services" is defined as "an act of assistance; help; aid."  *Random House College Dictionary* (rev. ed.).

7

With the foregoing definitions in mind, the Court turns to the "imagination test" and considers the relationship between those words and Plaintiff's services in the minds of the prospective purchasers, which includes property owners, tax professionals, and real estate trust managers around the country.  It is undisputed that Plaintiff prepares engineering-based reports for use by taxpayers in claiming tax benefits.  Plaintiff offers the following suite of "tax engineering services" or tax advisory services:  cost segregation reports, 179D energy studies, 45L energy studies, and research and development tax credit assistance.  (DE 111-3, Julio Gonzalez Dep. 14, 70.)  Notably, it is undisputed that Plaintiff utilizes an in-house engineer to prepare or review the reports.  (*Id.* at 70, 95.)

The use of an engineer has been long recognized as the favored approach to cost segregation and energy studies.   "Cost segregation is a study that basically helps breaks buildings into components so that . . . it can be depreciated as multiple components over different class lives." (*Id.* at 15.)  It is an engineering-based study or engineering-based report.  (*Id.* at 95.)  Although there are no prescribed qualifications for cost segregation preparers, the IRS has stated in a publication released in late 2004 that "a study by a *construction Engineer* is more reliable than one conducted by someone with no engineering or construction background."   (DE 110-16, at 8, IRS Cost Segregation Audit Technique Guide, Chapter 4, available at www.irs.gov (emphasis added).)

Likewise, a licensed engineer or contractor must issue a mandatory certification before a taxpayer can claim a 179D energy deduction.  By way of background, "179D is a tax benefit for people that create energy efficient buildings." (DE 111-3, Julio Gonzalez Dep. 36.)  Pursuant to the IRS's guidance, the certification for the 179D deduction must be issued by an "engineer or contractor that is properly licensed as a professional engineer or contractor in the jurisdiction that the building

8

is located." *See* IRS Notice 2006-52, 2006 WLNR 27711803 (June 26, 2006).[3]  As explained by Julio Gonzalez, Plaintiff's founder and CEO, "you have to have a licensed engineer go out and inspect it, a PE to make sure that what you reported as the equipment to come up with the energy calculations is there."  (DE 111-3, Julio Gonzalez Dep. 36.)

Hence, the record evidence shows that for over a decade, the utilization of a licensed engineer has been a common, if not the preferred, approach to cost segregation and tax energy studies, ensuring that the studies are based upon engineering and construction knowledge and are thus more reliable.  By adopting "Engineered Tax Services" as its mark, Plaintiff directly conveyed to prospective customers an important characteristic of its service.  The mark in question is a term which, to the consuming public, indicates a principal element of the service.

That the use of an engineer is not an absolute requirement for the provision of these services, which Plaintiff emphasizes, is of no moment.  To be merely descriptive, a mark need not convey a required element, but need only impart an important aspect of the service.  *See Zobmondo Entm't, LLC v. Falls Media, LLC*, 602 F.3d 1108, 1116 (9th Cir. 2010) ("[D]escriptive marks need not describe the 'essential nature' of a product; it is enough that the mark describe some aspect of the product.").  Because it is commonly understood that the utilization of a licensed engineer is a well-accepted approach to cost segregation and tax energy studies, and the mark describes that aspect of the services, the mark is merely descriptive.

---

[3]  The certification necessary in order to claim the tax deduction must be issued by a "qualified individual."  A "qualified individual" is an individual who is not related to the person claiming the deduction and is an "engineer or contractor that is properly licensed as a professional engineer or contractor in the jurisdiction that the building is located," and represents in writing to the taxpayer that he or she has the proper qualifications to provide the required certifications and inspections.  *See* IRS Notice 2006-52, 2006 WLNR 27711803 (June 26, 2006).

Similarly, neither the fact that an accountant is not required to prepare cost segregation and 179D energy studies, nor the fact that a preparer of these studies does not prepare or file tax returns, means that these services cannot be described as "tax services." There is no doubt that the only purpose of these studies is to aid or assist the taxpayer in claiming benefits on their U.S. tax returns.

Thus, after considering the relationship between the words in the mark and Plaintiff's services, from the perspective of the consuming public, the Court finds that potential consumers observing the mark "Engineered Tax Services" could readily perceive that the mark indicates an important characteristic of Plaintiff's services without having to exercise their imagination.[4]

Next, the Court finds that competitors would likely need to use the description "engineered tax services" in connection with their services. Courts look to the likelihood of prospective use by competitors to determine whether the formative words of a phrase are likely to be used by competitors in the industry. *See Investacorp*, 931 F.2d at 1523 (holding that competitors likely will need to use the terms "invest" and "corp" because the words pervade "the lexicon of business terminology" and are "indispensable to the investment services industry"). Due to the fact that engineer-prepared reports are a common aspect of cost segregation and energy studies, the term "engineered" is likely to be considered a useful term to describe the services at issue. Moreover, the Court notes that there are few words in the English language that can be used to imply planning by

_____

[4] It is undisputed that principles of engineering and engineering processes are an integral part of these studies, even those not directly prepared by engineers. The IRS recommends a "detailed engineering approach" as the "most methodical and accurate approach" to cost segregation. (DE 93-25 at 2.) Plaintiff readily admits that "blueprints and engineering reports of the building itself are used by the cost segregation preparer to classify the assets." (DE 100, Pl.'s Mot. at 18.) Because engineering is an aspect of the preparation of all cost segregation and energy studies, it does not require any stretch of the imagination to associate the mark "Engineered Tax Services" with Plaintiff's engineering-based tax advisory services.

an engineer or the application of engineering processes other than the word "engineered." There are few effective synonyms for the word "tax" as well. "Cutting off competitors from what amounts to a descriptive term (absent a showing of secondary meaning) would undermine the categorical system of trademarks federal law has established to protect inherently distinctive names." *Klayman v. Freedom's Watch, Inc.*, 765 F. Supp. 2d 1348, 1357 (S.D. Fla. 2008).

Finally, the popularity of actual usage of the key terms in the mark indicates that the mark is merely descriptive. *Gift of Learning Found., Inc.*, 329 F.3d at 798-99. Defendant has come forward with copies of pages from the websites of six different businesses that use the word "engineered" to refer to cost segregation or tax energy studies.[5] For example, RB Engineering uses

---

[5] First, the website for a heating-system business touted the benefits of tax deductions associated with a heating system as follows: "With the involvement of an independent *engineered tax services* firm to provide the IRS energy certification, we can work with you to potentially obtain EPAct tax deductions of up to $.60/sq ft for commercial/industrial buildings." (DE 93-15 (emphasis added).) Second, a website for Hayley Capital promotes its "*Engineered Cost Segregation*" services, including a "'*fully-engineered' study* that allows building owners to write off their building (new & existing) in the shortest amount of time permissible and the depreciation is brought forward." (DE 93-16 (emphasis added).) The welcome page of the website also states that it is "the leader within a team of businesses that work together to significantly reduce federal income taxes by offering a suite of *engineered and construction tax solutions* for for-profit commercial property owners." (See https://hayleycapital.com (emphasis added).) Third, a website for a utility-service company offers "*Engineered Cost Segregation*," and states that "engineered cost segregation study is designed to bring engineering expertise and tax accounting together toward reducing your income tax liability." (DE 93-17 (emphasis added).) Fourth, a website for a CPA firm offers "Engineering Tax Services" and states that "[t]aking advantage of *engineered tax credits* provides an opportunity to increase cash flow. Led by our own in-house engineer with 24 years of experience on federal tax depreciation issues, JLK Rosenberger's Engineering Tax Services Group (ETS) assists companies with the follow tax saving opportunities . . . ." (DE 93-18 (emphasis added).) Fifth, the website for RB Engineering, which offers "Structural, solar and forensic engineering and *engineered tax services*," states that it is "a multi disciplined structural engineering firm performing structural engineering, forensic engineering and *engineered tax services* in the Raleigh-Durham Triangle area and throughout North Carolina." (DE 93-19 (emphasis added).) Sixth, the website for Troon describes "*Engineered Tax Programs*" and its "strategic partnerships with industry leading, licensed energy engineering firms that marry the science of engineering with the principles of tax and accounting

11

the term "engineered tax services" (DE 93-19) and states that it offers both cost segregation studies and 179D energy certifications. (*See* www.rebengineering.com/Services.aspx.)  In addition, Plaintiff itself (through its representatives) has used the mark or a close cousin in its descriptive sense.  (*See e.g.,* DE 94-4 ("I am excited to bring these engineered tax services and the related benefits to my long-term family relationship."); DE 94-13 ("engineering tax services" and "engineered accounting solutions").)  The popularity of the use of the key words in the mark by competitors and others promoting similar services is substantial.[6]

Plaintiff argues that this evidence is not probative because these companies are not cost-segregation providers.  Regardless of how these companies are characterized, all of these companies use the term "engineered tax" or a close variation in a descriptive sense to promote cost segregation or energy studies.  Hence, the Court finds that the webpages are highly probative evidence that the term is descriptive in nature.

Having applied the prevailing guideposts and tests of descriptiveness to the term "Engineered Tax Services," the Court finds that Defendant has rebutted the presumption by coming forward with significantly probative evidence that the mark is merely descriptive in nature.  The dictionary definitions of the words comprising the mark indicate that the mark directs the public's attention to the use of an engineer or engineering knowledge as a feature of the tax services.  An exercise of the

---

to arrive at financial solutions that result in increased cash flow, minimized tax payments, and maximum return on investment and energy."  (DE 93-20 (emphasis added).  Also, the website for Ernst & Morris, under the tab "Information," refers to cost segregation as "an engineering-based study." (DE 93-22; https://costseg.com/cost-segregation/.)

[6]  The Court declines to strike Defendant's production on the last day of the discovery period of examples of actual third-party usage of the term "engineered tax services" in its descriptive sense (DE 121, Pl.'s Reply at 7), since Plaintiff has not shown any related prejudice.

imagination is not needed within the relevant industries to deduce that the mark "Engineered Tax Services" signifies an important aspect of Plaintiff's services.  Further, competitors will likely need to use the description in connection with their services, and competitors and others promoting the same services have used the term "engineered tax" as a way to convey a feature of the services.

> 2.    Secondary Meaning

When a mark is not inherently distinctive, the mark must have secondary meaning. Secondary meaning is defined as "the connection in the consumer's mind between the mark and the product's producer." *Gift of Learning Found.*, 329 F.3d at 800.  A plaintiff may prove secondary meaning with direct evidence, such as consumer surveys, or circumstantial evidence. *Tartell v. S. Fla. Sinus & Allergy Ctr., Inc.*, 790 F.3d 1253, 1257 (11th Cir. 2015).

> a.    Burden of Proof

As an initial matter, the Court rejects Plaintiff's argument that Defendant has the burden of showing that the mark has not acquired secondary meaning.   As noted above, the parties at least agree that, if the PTO registers a mark without first requiring the applicant to prove secondary meaning and the mark remains contestable, as in this case, the holder of the mark is entitled to a presumption that its registered trademark is inherently distinctive, as opposed to merely descriptive. *Borinquen Biscuit Corp. v. M.V. Trading Corp.*, 443 F.3d 112, 117 (1st Cir. 2006).  Under those circumstances, "the effect of registration for a contestable mark is to shift the burden of proof from the plaintiff . . . to the defendant, who must introduce sufficient evidence to rebut the presumption of the plaintiff's right to [exclusive] use through proof that the mark is merely descriptive." *Id.* (citations and internal quotation marks omitted).

The parties' dispute revolves around which party bears the burden on the separate issue of

13

whether the mark has acquired secondary meaning.  Defendant argues that if the burden of establishing descriptiveness is met, as in this case, then the burden shifts back to Plaintiff to establish that the mark has acquired secondary meaning.  This burden-shifting framework was articulated in *Borinquen*, 443 F.3d at 117, and cited in dicta by the Eleventh Circuit in *Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1357 n.3 (11th Cir. 2007) ("The sort of presumption appropriate depends on whether or not the Patent and Trademark Office has required proof of secondary meaning. *See Borinquen Biscuit Corp. v. M.V. Trading Corp*., 443 F.3d 112, 117 & n. 2 (1st Cir. 2006) (If no proof of secondary meaning is provided, presumption is that mark is inherently distinctive; if proof of secondary meaning is provided, presumption is that mark has secondary meaning.)").

Instead of the framework set forth in *Borinquen*, and cited with approval in *Welding Servs*., Plaintiff argues that this Court should follow the guidance in *U.S. Search, LLC v. U.S. Search.com Inc*., 300 F.3d 517, 524 (4th Cir. 2002), wherein the court states that "with a certificate of registration, the registrant obtains prima facie evidence that its mark is not generic in the eyes of the relevant public,  and that its mark is not merely descriptive, but at a minimum is descriptive and has obtained secondary meaning." *Id.* (internal citations and quotation marks omitted).  That guidance was mentioned only in passing by a district court tasked with determining the evidentiary effect of a Florida trademark registration in *Vokal, Inc. v. Nelly*, No. 6:04 CV 254 ORL 31DA, 2005 WL 2304965, at *4 (M.D. Fla. Sept. 21, 2005), *aff'd*, 181 F. App'x 960 (11th Cir. 2006).

After carefully considering the parties' arguments and the case law, this Court is persuaded by the majority rule that where the PTO has not required proof of secondary meaning, no presumption should attach to the issue of secondary meaning.  Under 15 U.S.C. § 1052(f), the PTO may register a descriptive mark if the applicant presents sufficient proof that the mark has secondary

meaning.  Here, the parties do not dispute that the PTO did not require proof that the mark has secondary meaning.  When the PTO "registers a mark without requiring proof of secondary meaning, the mark is presumed to be inherently distinctive," not merely descriptive with acquired secondary meaning.  *See Welding Servs.*, 509 F.3d at 1357 n. 3; *see also Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 537 n. 1 (5th Cir. 2015) ("[T]here is no evidence in the record that the PTO examined evidence of secondary meaning. We therefore presume inherent distinctiveness.").

Because the PTO did not require evidence of secondary meaning, there is no basis for presuming that the mark has acquired secondary meaning and placing the burden on the defendant to rebut that presumption.  *See Zobmondo Entm't, LLC v. Falls Media, LLC*, 602 F.3d 1108, 1114 n.7 (9th Cir. 2010) ("[T]he registrant is not entitled to a presumption of secondary meaning unless the PTO required proof of secondary meaning as part of the application for registration of the mark."); *PaperCutter, Inc. v. Fay's Drug Co.*, 900 F.2d 558, 564 (2d Cir. 1990) ("The existence of secondary meaning is a question of fact with the burden of proof on the party claiming exclusive rights in the designation. This burden does not shift upon a decision of the Patent and Trademark Office to register the mark, absent evidence that the Office registered the mark upon finding that it had acquired secondary meaning.").

Here, there is no evidence that the PTO registered the mark upon a finding that the mark had acquired secondary meaning, and this Court "will not defer to an ethereal determination that is not affirmatively stated by the administrative agency." *Investacorp*, 931 F.2d at 1524.  Accordingly, the Court is persuaded that the burden to prove that the mark has acquired secondary meaning rests with Plaintiff.

b.      Factors

Having concluded that Plaintiff has the burden, the Court turns to the issue of whether Plaintiff has met its burden of showing acquired secondary meaning. "The chief inquiry is the attitude of the consumer toward the mark; does it denote to him a, single thing coming from a single source? Short of a survey, this is difficult of direct proof." *Aloe Creme Labs., Inc. v. Milsan, Inc*., 423 F.2d 845, 849 (5th Cir. 1970) (internal citation, quotation marks, and footnote omitted). Where, as here, the plaintiff has not provided direct evidence of secondary meaning through surveys, a court should consider the following four factors to determine if circumstantial evidence establishes that a mark has acquired secondary meaning:

> (1) the length and nature of the name's use, (2) the nature and extent of advertising and promotion of the name, (3) the efforts of the proprietor to promote a conscious connection between the name and the business,[7] and (4) the degree of actual recognition by the public that the name designates the proprietor's product or service.

*Tartell*, 790 F.3d at 1257 (citation and internal quotation marks omitted). Although secondary meaning is a question of fact, summary judgment in the defendant's favor may be upheld if the plaintiff fails to raise a genuine issue of fact on secondary meaning. *See Investacorp*, 931 F.2d at 1525-26 (affirming district court's order granting summary judgment in favor of defendant where the evidence did not create a genuine issue of fact as to secondary meaning). Further, the "[p]laintiff has the burden of sustaining a high degree of proof in establishing a secondary meaning for a descriptive term. This requisite high degree of proof must be considered by the court when ruling on a motion of summary judgment." *Id.* at 1525 (footnotes omitted).

As indicated in its Motion for Summary Judgment (DE 100, Pl.'s Mot at 15-17), Plaintiff

---

[7] Plaintiff has not indicated that it has submitted evidence specific to this factor in support of a showing that its mark has acquired secondary meaning.

16

submits the following evidence in support of its position that the mark has acquired secondary meaning: (1) Plaintiff's continuous use of the mark since November 2006; (2) CEO Gonzalez's appearances on Capitol Hill, on television and radio programs, and in newspaper and magazine articles discussing tax revisions and reform and his notoriety as a "Tax Reform Expert"; (3) Mr. Gonzalez's sponsorship of events to the "Family Office" community on the topic of real estate trusts; (4) Mr. Gonzalez's associations with the cast of *New York Housewives*; and (5) Defendant's admission in an internal e-mail that Plaintiff is "heavy on marketing" and implicit suggestion that potential customers use the term "engineered tax services" to search for Plaintiff's business.  The Court will consider this evidence in conjunction with the four factors enumerated above.  As discussed below, the Court finds that this evidence falls short of creating a jury question on the issue of secondary meaning.

### 1.    Length and Nature of Use

As to the length and nature of Plaintiff's use, it is undisputed that Plaintiff began using the mark "Engineered Tax Services" to promote its cost segregation services in 2006 and Defendant began using the mark as a keyword and in ad copy as part of  its Google AdWord program in April 2014.  Thus, the length of Plaintiff's use was eight years (prior to Defendant's use of their mark).  Courts have found that similar durations of use do not, alone, raise a factual issue for trial with respect to secondary meaning.  *Investacorp*, 931 F.3d at 1525 (upholding finding of no secondary meaning after five years of use), *Vision Ctr.*, 596 F.2d at 119 & n.22 (finding no secondary meaning after 20 years of use (and no media advertising for most of that time); *Aloe Creme*, 423 F.2d at 847-50 (upholding finding of no secondary meaning after 12 years of use); *see also EL Holdings Lake City, LLC v. Lake City RV Resort, LLC*, No. 4:15CV523-RH/CAS, 2016 WL 10637091, at *2

(N.D. Fla. Aug. 3, 2016) ("That the mark had been in use for ten years does not, without more, suggest that the mark had acquired secondary meaning.").

2.    Nature and Extent of Promotion of the Mark

As to the second factor, the nature and extent of promotion and advertising of the name, the Court finds that the evidence in the record is scant and misses the mark. As further discussed below, Plaintiff's evidence overwhelmingly emphasizes CEO Gonzalez's relationships with governmental officials in Washington D.C. and wealthy families, which are but small segments of the relevant consuming public.

First, Plaintiff points to Mr. Gonzalez's discussions of tax revisions and tax reform on Capitol Hill and through various media outlets.[8] Plaintiff boasts that Mr. Gonzalez has become known as a "Tax Reform Expert" as a result of these marketing efforts. (DE 100, Mot. at 16.) Plaintiff also emphasizes that Mr. Gonzalez's marketing efforts have "actually put the use of cost segregation studies in the public eye and ha[ve] educated the consuming public on the benefits of this particular type of tax deduction available to real property owners through the IRS." (*Id.* at 16-17.)

The obvious problem with these legislative and educational efforts (apart from the fact that

---

[8]  In support, the record contains an article relating to these efforts, which is dated April 24, 2017, entitled "How Family Office Manager Julio Gonzalez is Helping Keep Jobs in the U.S. Using Tax Engineering." (DE 100-17.) The record also contains a list of the following three other articles that were written about Mr. Gonzalez in 2017: "DC Tax Advisor Julio Gonzalez Explains the Problem with Current Tax Reform Blueprint, Full Expensing"; "DC Insider Reveals the Hottest Topic on the RNC's Agenda"; and " Mr. Gonzalez Goes to Washington: Tax Engineer Explains Trump Admin's Proposed Tax Reform and How He's Advising DC." (DE 100-18). Plaintiff's Motion for Summary Judgment also directs the Court to a press release located online entitled "Tax Reform Expert, Julio Gonzalez, Agrees with New Bill for Tax Reform." (DE 100, Mot. at 16 n.79.)

18

the articles cited in the record were all written in 2017) is that they are geared towards promoting tax reform and educating the public about cost segregation in general, not promoting the connection between the mark "Engineered Tax Services" and Plaintiff's business. *See Gift of Learning Found.*, 329 F.3d at 801 (finding lack of secondary meaning where the plaintiff's promotional efforts were not geared towards promoting the connection between the mark and its business in the public's mind); *Tartell,* 790 F.3d at 1258 (reasoning that the district court clearly erred when it found that plaintiff had established secondary meaning because plaintiff's "evidence about the use of his name in academic settings and evidence about his reputation among other medical professionals are not probative of whether his name had acquired secondary meaning" in the minds of the consuming public).

Next, Plaintiff points to Mr. Gonzalez's own sponsorship of events to show secondary meaning.  Plaintiff claims that Mr. Gonzalez has sponsored an unspecified number of "events for Family Office members to discuss real estate trusts."  (DE 100, Mot. at 16.)  The record indicates that a "family office" is a "shorthand for the wealthiest families in the country having an office to handle their wealth."  (DE 111-3, Julio Gonzalez Dep. 140.)  As to these Family Office events, Plaintiff has pursued an advertising strategy that is likely to reach members of only the wealthiest families in the country.  Plaintiff admits that this advertising strategy is unique in the cost segregation community.  (*Id.* at 141.)  The weakness in Plaintiff's argument is that however unique and effective the strategy in terms of bringing wealthy families to the business of cost segregation, there is no evidence that Mr. Gonzalez's events extended beyond this subset to the larger consuming public. *See Japan Telecom, Inc. v. Japan Telecom Am. Inc.*, 287 F.3d 866, 875 (9th Cir. 2002) ("In examining whether a plaintiff's advertising is enough to establish secondary meaning, we look at the

advertising's amount, nature and geographical scope with an eye towards how likely the advertising is to expose a large number of the relevant consuming public to the use of the symbol as a trademark or trade name." (citation and internal quotation marks omitted)).

Also as to promotion and advertising activities, Plaintiff emphasizes that Tinsley Mortimer of *New York Housewives* worked as an event planner for Plaintiff and related entities. However, there is no evidence that Plaintiff used Ms. Mortimer's celebrity status to call attention to the mark in the minds of the consuming public. Instead, during his deposition, Mr. Gonzalez emphasized that Ms. Mortimer's celebrity status allowed him to meet certain families on the East Coast and admitted that she helped his Family Office more than Plaintiff. (DE 111-3, Juan Gonzalez Dep. 88, 143.) Plaintiff also admitted that Ms. Mortimer brought only one new client to Plaintiff and even that "was a miracle." (*Id.* at 88.)

In addition, Plaintiff notes that Mr. Gonzalez has even appeared on an episode of the show *New York Housewives*. However, Plaintiff has not shown how Mr. Gonzalez's mere appearance on a television show supports a connection between the mark and Plaintiff's business. Mr. Gonzalez's own notoriety in the minds of a discrete group of television viewers does not establish a jury question on the issue of whether Plaintiff's mark has acquired secondary meaning. *Tana v. Dantanna's*, 611 F.3d 767, 777 (11th Cir. 2010) ("Even the use of the name "Dan Tanna" in the television series "Vega$," which aired for a few years in the late 1970s and early 1980s, suggests nothing more than that the name "Dan Tana's" may have a familiar ring to a discrete group of television enthusiasts who viewed the program twenty to thirty years ago, not that present-day patrons of Dantanna's Atlanta would specifically associate the name with Plaintiff's restaurant.").

Finally, Plaintiff emphasizes that Thomas Scarpello, who is the founder of Defendant,

admitted in an internal e-mail that Plaintiff is "heavy on marketing."   At his deposition, MR.

Scarpello explained that he had observed Plaintiff use different marketing materials, like e-mail

blasts and "a significant number of outside contractor business development folks in the

marketplace." (DE 111-2, at 20, Thomas Scarpello Dep. 78.)  However, Plaintiff has not placed

samples of these e-mails or any evidence of the extent of the e-mail campaign in the record, and there

is no information on the nature or extent of its business development efforts and their effectiveness

in promoting the mark.  Without more detailed information, the Court cannot determine whether

Plaintiff's "advertising campaigns made major inroads to the consumer psyche." *Investacorp*, 931

F.2d at 1526.

    In summary, the Court finds that the evidence in the record on the nature and extent of

advertising and promotion of the mark is far too slim to avoid summary judgment on the issue of

secondary meaning.[9]

### 3.    Actual Recognition

    The last factor that the Court considers is the degree of actual recognition by the public that

the name designates the proprietor's service.  *Tartell*, 790 F.3d at 1257.  Plaintiff underscores that

---

[9]  The Court is mindful that the record contains other vague mentions of Plaintiff's marketing efforts, such as posting of online videos, attending trade shows and conferences, hosting of networking engagements, and telemarketing.  None of these marketing efforts are specifically discussed in Plaintiff's briefs.  Further, the extent to which Plaintiff held these events or engaged in these activities and their effectiveness in promoting the connection between Plaintiff's mark and its business are not in the record.  The vague evidence regarding these marketing efforts and the efforts of Plaintiff's CEO is not sufficient to show secondary meaning. *Tropic Ocean Airways, Inc. v. Floyd*, 598 F. App'x 608, 612 (11th Cir. 2014) (affirming dismissal where trademark owner "failed to allege the nature and extent of advertising and promotion or its efforts to promote a conscious connection in the public's mind" and plaintiff's "bare allegations are insufficient to establish that Tropic's mark has acquired secondary meaning").

Thomas Scarpello, founder of Defendant, made a remark in an internal e-mail surmising that as a result of an increase in traffic from using the keyword "Engineered Tax Services" as part of Defendant's Google campaign, Defendant "was taking clients from" Plaintiff's business.  (DE 100-7.)  However, in another internal e-mail, Mr. Scarpello characterized Plaintiff's mark as merely a "generic term[]" not capable of registration, implying that the mark is used to refer to the basic nature of the parties' services, not Plaintiff's business in particular.  (DE 100-4.)  Despite Plaintiff's attempt to patch together a showing of secondary meaning from Mr. Scarpello's e-mails, the Court concludes that Mr. Scarpello's hypothetical and inconsistent musings and the other scant evidence in the record is insufficient to raise a genuine issue of material fact on the issue of whether Plaintiff has established secondary meaning.

Because the proffered evidence provides insufficient specific facts regarding the nature and extent of advertising and promotion of the mark, Plaintiff's efforts to promote a connection between the mark and its business, and the degree of actual recognition by the public that the mark designates Plaintiff's services, Plaintiff has failed to raise a genuine issue of material fact as to whether the mark has acquired secondary meaning.  Based on the evidence that has been presented to the Court, no reasonable jury could find that a secondary meaning exists in the alleged mark.

Because there was no protectable interest in the asserted mark, the consumer confusion analysis is immaterial.   *Gift of Learning Found*., 329 F.3d at 801("The confusion that plaintiff claims exists is irrelevant unless the mark is protectable in the first instance.").   Accordingly, summary judgment shall be granted to Defendant on the Lanham Act claim asserted in Count I.

B.      Other Lanham Act Claims (Counts II through V)

Plaintiff has also brought unfair competition, initial interest confusion, designation of origin,

22

and dilution claims under the Lanham Act.  Each of these claims is subject to summary judgment for the same reasons that the trademark infringement claim fails, as discussed further below.

Count II asserts a claim of unfair competition under the Lanham Act.  The Court addresses Plaintiff's claim for unfair competition under 15 U.S.C. § 1125(a) using the same analysis applied to Plaintiff's claim for trademark infringement because "the same facts support a cause of action for unfair competition as for trademark infringement; if there is no genuine issue of fact as to trademark infringement, there is none as to unfair competition, either."  *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1475 n. 3 (11th Cir.1991).  Because there is no genuine issue of fact as to Plaintiff's trademark infringement claim, there is no genuine issue of material fact as to the unfair competition claim and it fails as well.

Count III asserts a claim of initial interest confusion.  The Court need not consider whether the doctrine of initial interest confusion is actionable in this circuit because "[t]he confusion that plaintiff claims exists is irrelevant unless the mark is protectable in the first instance."  *Gift of Learning Found.*, 329 F.3d at 801.  Because Plaintiff has not shown that it has a protectable interest in the asserted mark, the consumer confusion analysis is immaterial.  Accordingly, the Court concludes that Defendant is entitled to summary judgment on the federal initial interest confusion claim.

Count IV asserts a claim under the federal anti-dilution statute, 15 U.S.C. § 1125(c). The statute generally provides protection to the owner of a "famous mark" from any use that causes dilution of the mark. 15 U.S.C. § 1125(c)(1).  A mark is "famous" only if "it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A).  The test of whether a mark has acquired

fame for purposes of the federal anti-dilution statute requires "a great deal more" than the analysis used to determine if secondary meaning has attached to a descriptive mark for purposes of a federal trademark infringement claim. *I.P. Lund Trading ApS v. Kohler Co.*, 163 F.3d 27, 47 (1st Cir. 1998) ("Certainly, the mere acquisition of secondary meaning to achieve trademark status in a non-inherently distinctive designation is nowhere near sufficient to achieve the status of 'famous mark' under the anti-dilution statute. The acquisition of secondary meaning merely establishes the minimum threshold necessary for trademark status: section 43(c) requires a great deal more." (citation omitted)); *see also Milbank Tweed Hadley & McCloy LLP v. Milbank Holding Corp.*, No. CV 06-187-RGK (JTLX), 2007 WL 1438114, at *5 (C.D. Cal. Feb. 23, 2007) (The question of fame is similar to the question of secondary meaning discussed above in connection with MT's unfair competition claims. However, fame is substantially more difficult to prove than secondary meaning. A mark that is famous necessarily has secondary meaning. However, a mark that has secondary meaning is not necessarily famous. Thus, since MT has failed to provide evidence sufficient to establish secondary meaning it has also failed to provide evidence establishing fame."). Because Plaintiff has failed to present sufficient evidence to establish secondary meaning, Plaintiff's claim to a famous mark also fails. As such, the Court concludes that Defendant is entitled to summary judgment on the federal dilution claim.

Count V asserts a claim of false designation of origin under the Lanham Act. As with Plaintiff's claims for trademark infringement and unfair competition under the Lanham Act, in order to prevail on a federal false designation of origin claim under the Lanham Act, the plaintiff must prove secondary meaning where protection is sought for a descriptive mark. *See Univ. of Georgia Athletic Ass'n v. Laite*, 756 F.2d 1535, 1541 (11th Cir. 1985). Because Plaintiff failed to prove

24

secondary meaning, the Court concludes that Defendant is entitled to summary judgment on the federal false designation of origin claim.

C.    Deceptive Trade Practices Claim under Common Law (Count VII)

Count VII asserts a claim of deceptive and unfair trade practices under Florida common law based upon infringement.  The analysis governing claims for violations of the Lanham Act and claims under Florida state common law for infringement are the same.  *Suntree Techs., Inc. v. Ecosense Int'l, Inc.*, 693 F.3d 1338, 1345 (11th Cir. 2012).  Accordingly, the Court concludes that Defendant is entitled to summary judgment on the common law deceptive and unfair trade practices claim.

D.    Trespass and Unjust Enrichment Claims (Counts VI and VIII)

Plaintiff brings state-law trespass and unjust enrichment claims under Florida common law. The Court declines to exercise supplemental jurisdiction over these state-law claims and therefore they are dismissed without prejudice.  *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1089 (11th Cir. 2004) ("We have encouraged district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial.").

**III.    CONCLUSION**

Based upon the foregoing, the Court concludes that summary judgment is granted in Defendant's favor as to Counts I, II, III, IV, V, and VII of the Complaint for failure to demonstrate ownership of a protectable mark.  The Court dismisses Counts VI and VIII of the Complaint without prejudice.

Based upon the foregoing, it is **ORDERED AND ADJUDGED** that Defendant's Motion for Summary Judgment (DE 93) is **GRANTED** in part and **DENIED** in part.  The Motion is granted

as to Counts I, II, III, IV, V, and VII of the Complaint, and denied as to Counts VI and VIII, which are dismissed without prejudice.  Plaintiff's Motion for Summary Judgment (DE 100) is **DENIED**. Judgment in Defendant's favor on Counts I, II, III, IV, V, and VII of the Complaint will be entered by separate order.

       **DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 30th day of July, 2018.

                                 KENNETH A.  MARRA
                                 United States District Judge